IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

KEVIN DEON MILLER,                )
                                  )
        Plaintiff,                )
                                  )
        v.                        )        Civil Action No. 2:16-cv-937-MHT-WC
                                  )
CITY OF DOTHAN, ALABAMA,          )
                                  )
        Defendant.                )

**RECOMMENDATION OF THE MAGISTRATE JUDGE**

## I.    INTRODUCTION

On December 2, 2016, Kevin Deon MIller ("Plaintiff"), proceeding *pro se*, filed a
Complaint (Doc. 1) appearing to allege claims for employment discrimination and
retaliation in violation of his rights under Title VII of the Civil Rights Act of 1964, 42
U.S.C. § 2000e, *et seq*.  Plaintiff sued his employer, the Dothan Police Department, and
several individual defendants, including, *inter alia*, supervisors at the Dothan Police
Department and the Dothan City Manager.  On January 11, 2017, Defendant filed a Motion
to Dismiss (Doc. 7) Plaintiff's complaint pursuant to Rule 12(b)(6) of the Federal Rules of
Civil Procedure.  On February 2, 2017, pursuant to Rule 15(a)(1)(B), Plaintiff filed his
Amended Complaint (Doc. 10).  The Amended Complaint asserts claims against the City
of Dothan only.  There are two express causes of action: "Race Discrimination in
Discipline," in violation of Title VII, and "Retaliation," also in violation of Title VII.  Doc.
10 at ¶¶ 6-16.  Presently before the court is Defendant's Motion for Summary Judgment
(Doc. 22) and Plaintiff's Motion for Leave to Amend Complaint (Doc. 26).  The District

Judge has referred this matter to the undersigned United States Magistrate Judge "for consideration and disposition or recommendation on all pretrial matters as may be appropriate." Doc. 3. The motions are fully briefed and are ripe for recommendation to the United States District Judge.[1]  For the reasons that follow, the undersigned RECOMMENDS that Defendant's Motion for Summary Judgment (Doc. 22) be GRANTED, and that Plaintiff's Motion for Leave to Amend Complaint (Doc. 26) be DENIED. The undersigned will address each motion separately.

## II.    MOTION FOR SUMMARY JUDGMENT

### A.    Standard of Review

Under Rule 56(a) of the Federal Rules of Civil Procedure, a reviewing court shall grant a motion for "summary judgment if the movant shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). Only disputes about material facts will preclude the granting of summary judgment. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 249 (1986). "An issue of fact is 'genuine' if the record as a whole could lead a reasonable trier of fact to find for the nonmoving party. An issue is 'material' if it might affect the outcome of the

---

[1]  Plaintiff did not file a response to Defendant's Motion for Summary Judgment. The court's Uniform Scheduling Order (Doc. 14), entered on March 20, 2017, set a deadline for the filing of dispositive motions for October 2, 2017, and further instructed that "[t]he failure to file a response to any motion – either dispositive or non-dispositive – within the time allowed by the Court shall indicate that there is no opposition to the motion." Doc. 14 at § 6. The court's separate Order (Doc. 15) concerning the filing of dispositive motions, also entered on March 20, 2017, instructed that a party opposing summary judgment must file his or her response "not later than 21 days" after the filing of the dispositive motion. Doc. 15 at ¶ 2. Plaintiff has provided no reason for his failure to file a response to the motion for summary judgment and has not asked for leave of the court to file a response out-of-time.

case under the governing law." *Redwing Vehicleriers, Inc. v. Saraland Apartments*, 94 F.3d 1489, 1496 (11th Cir. 1996) (quoting *Anderson*, 477 U.S. at 248).

Under Rule 56, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrates the absence of a genuine issue of material fact." *Id.* at 323. The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of his case on which he bears the ultimate burden of proof. *Id.* at 322–23.

Once the movant has satisfied this burden, the nonmoving party must "go beyond the pleadings and by his own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324. In doing so, and to avoid summary judgment, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The parties must support their assertions "that a fact cannot be or is genuinely disputed" by "citing to particular parts of materials in the record, including depositions, documents, electronically

stored information, affidavits or declarations, stipulations[], admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1)(A) & (B).

If the nonmovant "fails to properly address another party's assertion of fact" as required by Rule 56(c), then the court may "consider the fact undisputed for purposes of the motion" and "grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it."  Fed. R. Civ. P. 56(e)(2) & (3).

In determining whether a genuine issue for trial exists, the court must view all the evidence in the light most favorable to the nonmovant.  *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003).  Likewise, the reviewing court must draw all justifiable inferences from the evidence in the nonmoving party's favor. *Anderson*, 477 U.S. at 255.  However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion."  *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam).  Furthermore, "[a] mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party."  *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990); *see also Anderson*, 477 U.S. at 249-50 ("If the evidence [on which the nonmoving party relies] is merely colorable, or is not significantly probative, summary judgment may be granted.") (internal citations omitted).

### B.     Statement of Facts

In the court's Order setting guidelines for the filing of dispositive motions, the parties were directed, prior to filing dispositive motions and responses thereto, to "confer and agree upon the facts which are uncontested," and were further advised that the court would "rely upon the parties' representations in its determination of whether there is a genuine issue of material fact."  Doc. 15 at § 5.  Defendant has presented a lengthy statement of "undisputed material facts" covering topics including "Plaintiff's Employment with the City," "The City's Policies," "Plaintiff's Weapons Policy Violation," "Plaintiff's Grievance," and "Plaintiff's EEOC Charge and Subsequent Events."  *See* Doc. 22 at § 2, ¶¶ 1-74.  After Plaintiff failed to file any response to Defendant's motion or provide his own statement of facts, contested or otherwise, counsel for Defendant "certifie[d] that the parties have conferred regarding the undisputed material facts included in [the] Motion for Summary Judgment . . . and Plaintiff's counsel had no disagreement with Defendant's undisputed material facts."  Doc. 27 at 3.  Upon review, the undersigned finds that Defendant's statement of undisputed facts is supported by the evidentiary materials provided by Defendant in support of its motion.  Accordingly, pursuant to Rule 56(e)(2) and § 6 of the Uniform Scheduling Order (Doc. 14), the undersigned concludes that Defendant's statement of undisputed facts is due to be adopted by the court as uncontested for purposes of the Motion for Summary Judgment.  That statement of uncontested facts, edited lightly for content and for purposes of formatting and incorporation into this Recommendation, is as follows:

**Plaintiff's Employment with the City**

Plaintiff, a black male, was hired by the City as a police officer in February 2008. *See* Deposition of Kevin Miller ("Miller Depo.") (Doc. 23-1) 92:13-15; 162:5-6.  One of the responsibilities that was assigned to Plaintiff from the time he became a corporal was to make and distribute the line-up. Miller Depo. 131:15-133:17.  Plaintiff was also assigned responsibility over vehicle inspection, uniform inspection, and the briefing recap. Miller Depo. 133:18-136:15.

Plaintiff understood that he was expected to follow verbal instructions received from his supervisors. Miller Depo. 134:10-12.  The Police Department has an electronic system called "Guardian Tracking" whereby supervisors can note an officer's merits and opportunities for improvement. Plaintiff could review any entries made about him and respond to those entries. Miller Depo. 144:22-146:14.  Plaintiff's supervisors made positive entries about him in Guardian Tracking, commenting on his initiative and his positive feedback from citizens. Miller Depo. 146:1-152:10.  Plaintiff made complaints or responded in Guardian Tracking whenever he felt harassed or discriminated against. Plaintiff is unable to identify any complaints that he made to which he did not receive a response. Miller Depo. 142:3-144:21; 368:2-18.

In January 2015, Sergeant Derrick Wieczorek ("Sgt. Wieczorek") made a Guardian Tracking entry about Plaintiff disregarding backup. Miller Depo. Exhibit 10, pg. 19 (Doc. 23-1, p. 193).  In May 2015 and again in October 2015, Plaintiff received Performance Improvement Plans ("PIPs") addressing various performance deficiencies. Miller Depo. 291:17-292:12, Exhibits 24 & 25 (Doc. 23-1 at 239-241).  In June 2015, Plaintiff's

supervisors spoke to him about his performance as a field training officer ("FTO") and addressed with him his failure to properly document his training of a rookie. Miller Depo. Exhibit 10, pg. 15-16 (Doc. 23-1 at 189-91).   In September 2015, Sergeant Wieczorek counseled Plaintiff on Plaintiff's failure to back him up on a call. Miller Depo. Exhibit 10, pg. 14-15 (Doc. 23-1 at 188-89).

In February 2016, prior to Plaintiff filing an EEOC charge, Plaintiff complained that Sergeant William Phares ("Sergeant Phares") rushed him in conducting a robbery investigation. Declaration of Delvick McKay ("McKay Decl.") (Doc. 23-2) ¶ 4.   In July 2016, Plaintiff reported to officers responding to a call at his home that he believed a noose had been placed in his yard by two white male juveniles in his neighborhood who had previously been harassing his family and who were not employed by the City of Dothan. Miller Depo. 327:8-330:1, Exhibit 26 (Doc. 23-1 at 242-48).

On August 7, 2016 and August 10, 2016, Lieutenant Smith made a Guardian Tracking entry noting that he had talked to Plaintiff about his GPS malfunctioning. (Miller Depo. Exhibit 10, pg. 8-9 (Doc. 23-1 at 182-83).

Plaintiff's employment was terminated as a result of his gross insubordination on February 17, 2017. Miller Depo. 45:17-46:14; McKay Decl. ¶ 14.   Plaintiff appealed his termination to the Personnel Board, composed of four members, including one African-American female. The Personnel Board upheld Plaintiff's termination. McKay Decl. ¶¶ 10, 15.   Plaintiff has appealed the termination decision to the Houston County Circuit Court and the appeal remains pending as of the filing of the summary judgment motion. McKay Decl. ¶ 16.   Neither Plaintiff's EEOC Charge (filed August 15, 2016), Complaint (filed

7

December 2, 2016) or Amended Complaint (filed February 2, 2017) contain any allegations regarding his discharge. Docs. 1, 1-2, & 10.  No one at the City ever told Plaintiff that they were making any employment decisions based on his race. Miller Depo. 130:19-23.

**The City's Policies**

Upon the commencement of his employment, Plaintiff acknowledged receipt of the Dothan personnel rules and regulations employee handbook and understood that he was required to abide by the policies and procedures in the handbook. Miller Depo. 96:3-7, 100:22-101:2.  Plaintiff also understood, however, that the handbook may not cover every potential scenario that could happen in the workplace. Miller Depo. 102:5-12.  Plaintiff understood that the City had policies prohibiting discrimination and providing a reporting procedure for anyone who believed they had experienced discrimination. Miller Depo. at 94:16-95:1.

Plaintiff understood that per the Police Department's weapons authorization policy, which applied to all officers, firearms were to be stored in a safe manner and weapons should be secured in an officer's vehicle. Miller Depo. 106:1-110:22.  Plaintiff understood that police officers sometimes have to make judgment calls such as when to chase a suspect, when to fire a weapon, and when to write a ticket. Miller Depo. 112:3-113:8.  Plaintiff understood that it was the responsibility of a manager to provide feedback on work performance and that just because an employee may not agree with his manager, that disagreement does not mean that the manager is wrong. Miller Depo. 117:4-21.

**Plaintiff's Weapons Policy Violation**

On January 24 2016, Plaintiff violated Police Department policy by failing to properly secure his weapons in his patrol vehicle. Miller Depo. 166:6-9, Exhibit 13 (Doc. 23-1 at 211-12).  The violation occurred during an incident in which Plaintiff arrested a juvenile and transported him to the patrol room for booking. Plaintiff placed the juvenile's bicycle in his trunk and attempted to tie the trunk closed, but the trunk remained partially open and Plaintiff's shotgun and AR-15 rifle lay unsecured in the trunk in plain view. Miller Depo. 124:22-125:17, Exhibit 13 (Doc. 23-1 at 211-12).  Plaintiff entered the police station to book the juvenile, leaving his patrol vehicle with the unsecured weapons in the Police Department parking lot that is accessible to the general public. A relative of the arrested juvenile was parked directly beside Plaintiff's patrol vehicle. Miller Depo. 127:14-128:8, Exhibit 13 (Doc. 23-1 at 211-12).  At no point did Plaintiff ask anyone to secure the weapons in the trunk or radio for assistance in securing the weapons in his vehicle. Miller Depo. 127:7-13.  Sergeant Jonathan Whaley ("Sergeant Whaley") and Lieutenant Brian Smith ("Lieutenant Smith") noticed the unsecured weapons and removed the bicycle from the trunk and secured the weapons by closing and locking the trunk. Miller Depo. Exhibit 13 (Doc. 23-1 at 211-12).  Plaintiff's vehicle was unsecure for approximately thirty minutes. Miller Depo. 187:6-12, Exhibit 22 (Doc. 23-1 at 233).

Plaintiff admitted this violation on multiple occasions and admits that at the time the weapons were unsecured in his trunk he was not pursuing a suspect or in any other emergency situation. Miller Depo. 127:14-128:2, 128:17-22, 166:6-9.  Plaintiff also admits that his violation created a serious safety concern that put "a lot of people in danger." Miller Depo at 122:19-123:16.

On January 25, 2016, at Sergeant Whaley's request, Plaintiff submitted a "PD 12"—a form used generally within the Department for any type of complaint, request, or other communication—to Captain Todd David. Plaintiff's PD12 recounted the events from the previous day and stated: "I accidentally left my trunk tied down, but partially open with the bicycle inside. Sgt. Whaley closed my trunk after he discover[ed] my firearms inside and not secure. I appreciate Sgt. Whaley (sic) efforts to make sure it was locked up." Miller Depo. 175:15-177:21, Exhibit 14 (Doc. 23-1 at 213).  Plaintiff admits that this PD12 was in his own words and that he did indeed appreciate Sergeant Whaley's efforts because he realizes that someone could have been hurt due to his actions. Miller Depo. 177:15-178:2.

Plaintiff's actions in failing to secure his weapons were considered a first minor category offense under Rule 3-41(7), "failure to comply with standard procedures," and were a violation of PGO 200-11H, which requires that "[w]hile on duty, weapons will be secured with the officer or in the locked police vehicle." Miller Depo. at 167:3-12, Exhibit 13 (Doc. 23-1 at 211-12). As such, Sergeant Whaley, who is Caucasian, issued Plaintiff a formal counseling on February 17, 2016. Miller Depo. 161:10-162:4.  Sergeant Whaley met with Plaintiff to discuss the disciplinary action, letting him know that the precedent had already been set for the level of discipline that an officer would receive under these circumstances, that the formal counseling was not even a written warning, and assuring him that he generally did a good job as an officer. Miller Depo. 213:17-216:18, Exhibit 19 (Doc. 24).

**Plaintiff's Grievance**

On February 26, 2016, Plaintiff submitted a formal grievance to Chief Steve Parrish ("Chief Parrish") to contest the February 17, 2016 formal counseling. Miller Depo. 179:2-11, Exhibit 15 (Doc. 23-1 at 214-15).  In his grievance statement, Plaintiff complained that Officer Clifton Overstreet ("Officer Overstreet") had left his weapons unsecure inside an open vehicle while pursuing a subject who had fled on foot, but was not disciplined. Plaintiff stated: "My situation and Overstreet #862 situations were the same with different variables." Miller Depo. 179:2-11, Exhibit 15 (Doc. 23-1 at 214-15).  Plaintiff admitted in his grievance statement that Sergeant Whaley had explained to him that Officer Overstreet's situation was different because Officer Overstreet had an "emergency situation." Miller Depo. 179:2-11, Exhibit 15 (Doc. 23-1 at 214-15).

On March 4, 2016, Chief Parrish met with Plaintiff and gave him the opportunity to explain his grievance. Miller Depo. 194:12-195:6, Exhibit 16 (Doc. 23-1 at 216).  Plaintiff admitted to Chief Parrish that the failure to secure his weapons was a "mistake I made." Miller Depo. 204:9-12, Exhibit 17 (Doc. 24).  Chief Parrish explained that Captain Todd David ("Captain David") had been the one to recommend that Plaintiff receive discipline for leaving his weapons unsecure and that Officer Overstreet not be disciplined leaving his weapons unsecure. Miller Depo. 195:11-196:8. Chief Parrish discussed with Plaintiff the difference between his situation and Officer Overstreet's situation. Miller Depo. 206:13-19.  Chief Parrish also explained that the formal counseling should be viewed as a training aid and would not prevent Plaintiff from moving forward with his career. Miller Depo. 203:19-204:4.   Chief Parrish informed Plaintiff that other officers, including Officer Michael Etress ("Officer Etress") and Officer Damon Woodham ("Officer Woodham"),

had been written up for similar violations. Miller Depo. 205:20-206:2. Chief Parrish told Plaintiff that he did not intend to overturn Plaintiff's discipline, but explained to Plaintiff that he had the right to appeal the determination to the Personnel Board and assured Plaintiff that he did not have any problem with Plaintiff going through his due process. Miller Depo. 188:1-4; 206:8-19. Chief Parrish upheld the disciplinary action against Plaintiff, formally notifying Plaintiff that the action taken against him by his supervisor "was consistent with disciplinary action taken in the past." Miller Depo. 187:19-23, Exhibit 16 (Doc. 23-1 at 216).

Chief Parrish also had Sergeant Doug Magill perform a review of unsecured weapons discipline in recent years, which revealed that Officer Lance Steward ("Officer Steward"), Officer Brian Tate ("Officer Tate"), Lieutenant Etress, and Officer Woodham, all of whom are Caucasian males, received discipline for failing to secure their weapons. Miller Depo. 210:2-211:23; McKay Decl. ¶ 8. Officer Tate received a formal counseling and was required to attend a weapons safety class after leaving his trunk open with his rifle unsecured in the trunk while he was downloading video from his camera. Miller Depo. 210:5-211:11, Exhibit 18 (Doc. 23-1); McKay Decl. ¶ 8, Exhibit 1 (Doc. 23-2 at 8). Plaintiff was not required to attend a weapons safety training class after his unsecured weapons violation. Miller Depo. 211: 12-15. Officer Steward received a final written warning for his unsecured weapons violation, unlike Plaintiff who merely received a formal counseling. Miller Depo. 213:1-11, Exhibit 18 (Doc. 23-1 at 218); McKay Decl. ¶ 8, Exhibit 1 (Doc. 23-2 at 8).

Plaintiff appealed the grievance determination to Personnel Board Director Delvick McKay and had the opportunity to explain why he felt his discipline was unfair. Miller Depo. 188:3-22; 218:22-219:15.   Plaintiff admits that, based on his conversation with McKay, he believed McKay, who is an African-American male, was going to be fair and equal in his evaluation of the situation. Miller Depo. 220:7-13, 224:10-14.   McKay provided Plaintiff with a formal memorandum summarizing the findings of his investigation and notifying Plaintiff that the two incidents at issue warranted different responses. Miller Depo. 229:3-6, Exhibit 22 (Doc. 23-1 at 233-35).   Plaintiff admits that Officer Overstreet was chasing a suspect at the time that his vehicle was left unsecure and that Plaintiff was not chasing a suspect when his vehicle was left unsecure. Miller Depo. 187:6-12.   Plaintiff, who was working the night when Officer Overstreet's vehicle was left unsecured, heard Officer Overstreet call out on the radio for assistance in securing his vehicle. Miller Depo. 189:19-190:3.   Officer Overstreet's vehicle was unsecured for less than one minute. Miller Depo. 189:19-190:3, Exhibit 22 (Doc. 23-1 at 233-35).

**Plaintiff's EEOC Charge and Subsequent Events**

On August 15, 2016, Plaintiff filed an EEOC charge against the City, claiming that he had been unfairly disciplined for leaving his weapons unsecured in his vehicle. Doc. 1-2; Miller Depo. 239:13-20.   Plaintiff checked the boxes on his charge for "race" and "retaliation," but included no factual support for a retaliation claim. (Doc. 1-2).

On September 17, 2016, a senior dispatcher informed Lieutenant Smith that one of the other dispatchers had been made to feel uncomfortable by Plaintiff when he tapped her on the back of the shoulder during a previous conversation. The dispatcher at issue did not

want to make a formal complaint, but the senior dispatcher wanted Lieutenant Smith to be aware of the incident. McKay Decl. ¶ 11, Exhibit 2 (Doc. 23-2 at 20).  Lieutenant Smith attempted to talk to Plaintiff about the incident, not to discipline him but to "explain to him that [the dispatcher] felt uncomfortable during the conversation and to advise that he maintain personal boundaries regarding touch with co-workers." McKay Decl. ¶ 11, Exhibit 2 (Doc. 23-2 at 20).  Plaintiff did not receive any discipline as a result of the dispatcher's informal complaint and he did not have any change in pay or benefits as a result of it. Miller Depo. 277:16-278:2.

On November 21, 2016, Plaintiff created a line-up—as was his assigned responsibility—that was incorrect in multiple ways. The line-up was missing a unit number and other information for multiple officers, had a unit number in a location where it should not have been, and had the incorrect unit number for at least three different officers, including Plaintiff himself. Miller Depo. 285:1-289:12, Exhibit 23 (Doc. 23-1 at 236-38). Due to these errors, which were the latest in a series of similar mistakes, Plaintiff received a Performance Improvement Plan ("PIP") from Sergeant Jeremy Kendrick and Lieutenant Smith. Miller Depo. 278:13-280:6, Exhibit 23 (Doc. 23-1 at 236-38).  This PIP stated that Plaintiff "has failed to complete the squad line up accurately and in a timely manner on several occasions and depends on Officers to complete the line up for him." Miller Depo. Exhibit 23 (Doc. 23-1 at 236).

In January 2017, Plaintiff and Sergeant Wieczorek spoke inappropriately to one another during a conversation about Plaintiff's FMLA status and Plaintiff's failure to submit necessary documentation.  McKay Decl. ¶¶ 12-13 (Doc. 23-2).  The City's

14

EEO/Training Officer investigated this incident in response to Plaintiff's complaint about it and recommended counseling for both Plaintiff and Sergeant Wieczorek regarding appropriate temperament and communications in the workplace. McKay Decl. ¶¶ 12-13 (Doc. 23-2). The exchange did not relate in any way to Plaintiff's race or to his August 15, 2016 EEOC charge. McKay Decl. ¶ 13 (Doc. 23-2).

Plaintiff admits that none of the negative feedback he received from his supervisors affected his pay, benefits, job title, or rank. Miller Depo. 340:1-4. Plaintiff admits that there was room for improvement in his performance and that he cannot say that all of the negative feedback he received was untrue. Miller Depo. 338:7-23. Sergeant Phares never wrote Plaintiff up or disciplined him in any way. Miller Depo. 301:1-3, 307:6-11. Plaintiff has filed a total of four EEOC charges against the City, but admits that only his first charge is the basis for his claims in this lawsuit. Miller Depo. 157:22-159:14.

## C. Discussion

Plaintiff's Amended Complaint alleges Title VII claims for race discrimination and retaliation based upon the events described previously. Specifically, in Count One, Plaintiff claims that he was discriminated against, on the basis of his race, when he was "placed on probation for not securing his patrol vehicle." Doc. 10 at ¶ 9. He alleges that a similarly situated "Caucasian officer," Overstreet, "committed the same or substantially similar infraction, but was not disciplined or placed on probation." *Id.* at ¶ 11. In Count Two, Plaintiff claims that Defendant retaliated against him for his filing of a charge of discrimination "by creating a hostile work environment, by providing verbal and written negative feedback and by placing Plaintiff on a performance improvement plan ('PIP')."

*Id.* at ¶ 14.  Plaintiff further alleges that he was harassed as a result of his filing of the charge of discrimination when "Lieutenant Brian Smith, a Caucasian Supervisor, falsely accused Miller of sexually harassing a Caucasian, female dispatcher, on or about September 19, 2016."  *Id.* at ¶ 16.  Defendant seeks summary judgment on both of Plaintiff's claims, arguing that Plaintiff has failed to establish a *prima facie* claim for race-based discrimination or retaliation under Title VII and, even if he could establish a *prima facie* claim of discrimination or retaliation, he is unable to rebut Defendant's legitimate non-discriminatory and non-retaliatory reasons for its employment decisions.  Def.'s Mot. (Doc. 22) at 18-39.  The court will below examine each of Plaintiff's claims within the legal framework applicable to such claims.

### 1.    Title VII Discrimination Claims

### a.    Legal Standards

A Title VII disparate treatment claim premised on race requires a *prima facie* showing of discriminatory intent, *E.E.O.C. v. Joe's Stone Crab*, 220 F.3d 1263, 1286 (11th Cir. 2000), which "can be established three ways: 1) direct evidence; 2) circumstantial evidence; or 3) statistical proof."  *Davis v. City of Panama City, Fla.*, 510 F. Supp. 2d 671, 681 (N.D. Fla. 2007) (citing *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990)).  Plaintiff has not provided direct evidence that discrimination based upon his race was the reason for any alleged adverse employment action, nor has he proffered statistical evidence or evidence of a pattern of discrimination in this case.  Because Plaintiff's discrimination claim therefore relies upon circumstantial evidence, the claim is

analyzed under the burden-shifting framework described in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973).

Under the *McDonnell Douglas* framework, a plaintiff must first create a presumption of discrimination by establishing a *prima facie* case. *McDonnell Douglas*, 411 U.S. at 802. If the plaintiff establishes a *prima facie* case, then the "burden shifts to the employer to show a legitimate, non-discriminatory reason for its employment action." *Burke-Fowler v. Orange Cty., Fla.*, 447 F.3d 1319, 1323 (11th Cir. 2006) (citing *Joe's Stone Crab, Inc.*, 220 F.3d at1286). If the employer does so, the burden shifts again to the plaintiff to "prove that the reason provided by the defendant is a pretext for unlawful discrimination." *Id.*

As noted above, "the plaintiff first has the burden of establishing a *prima facie* case of discrimination, which creates a rebuttable presumption that the employer acted illegally." *McCalister v. Hillsborough Cty. Sheriff*, 211 F. App'x 883, 884-85 (11th Cir. 2006). To establish a *prima facie* case for racially disparate treatment in violation of Title VII, the plaintiff must show that: "'(1) [he] belongs to a protected class; (2) [he] was qualified to do the job; (3) [he] was subjected to adverse employment action; and (4) [his] employer treated similarly situated employees outside of [his] class more favorably.'" *Lewis v. City of Union City*, 877 F.3d 1000, 1015 (11th Cir. 2017) (quoting *Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008)).

As to the third prong, the requirement of an adverse employment action, "not all conduct by an employer negatively affecting an employee constitutes adverse employment action." *Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1238 (11th Cir. 2001).

17

> [T]o support a claim under Title VII's anti-discrimination clause the employer's action must impact the "terms, conditions, or privileges" of the plaintiff's job in a real and demonstrable way. Although the statute does not require proof of direct economic consequences in all cases, the asserted impact cannot be speculative and must at least have a tangible adverse effect on the plaintiff's employment.

*Id.* The employee "must show a *serious and material* change in the terms, conditions, or privileges of employment" and "the employee's subjective view of the significance and adversity of the employer's action is not controlling." *Id.* Rather, a reasonable person in the same circumstances must find the employment action materially adverse. *Id.*

As to the fourth prong of the *prima facie* test, in order to identify a viable comparator,

> the plaintiff must show that he and the employees are similarly situated in all relevant respects. *Smith v. Stratus Computer, Inc.*, 40 F.3d 11, 17 (1st Cir. 1994); *Mitchell v. Toledo Hospital*, 964 F.2d 577, 583 (6th Cir. 1992); *Smith v. Monsanto Chemical Co.*, 770 F.2d 719, 723 (8th Cir. 1985), *cert. denied*, 475 U.S. 1050 (1986). In determining whether employees are similarly situated for purposes of establishing a prima facie case, it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways. *Williams v. Ford Motor Co.*, 14 F.3d 1305, 1309 (8th Cir. 1994). *If a plaintiff fails to show the existence of a similarly situated employee, summary judgment is appropriate where no other evidence of discrimination is present. See, e.g.*, *Mack v. Great Atlantic and Pacific Tea Co.*, 871 F.2d 179, 182 (1st Cir. 1989).

*Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997) (emphasis in original). A proper comparator is an employee outside of the plaintiff's protected class who is similarly situated to the plaintiff "in all relevant respects." *Coar v. Pemco Aeroplex, Inc.*, 372 F. App'x 1, 3 (11th Cir. 2010) (quoting *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1091

18

(11th Cir. 2004)).   "This prevents 'courts from second-guessing employers' reasonable decisions and confusing apples with oranges.'"   *Id.* (quoting *Burke-Fowler*, 447 F.3d at 1323).

> [I]n disciplinary contexts, the quality and quantity of a comparator's conduct must be nearly identical to the plaintiff's in order to prevent courts from second-guessing a reasonable decision by the employer. *Maniccia v. Brown*, 171 F.3d 1364, 1368-69 (11th Cir. 1999).   While not always the case, differences in treatment by different supervisors or decisionmakers can seldom be the basis for a viable claim of discrimination. [*Silvera v. Orange Cty. Sch. Bd.*, 244 F.3d 1253, 1259 n.5 (11th Cir. 2001)].

*Foster v. Biolife Plasma Servs., LP*, 566 F. App'x 808, 811 (11th Cir. 2014).

Where a plaintiff succeeds in establishing a *prima facie* case of discrimination, under the *McDonnell Douglas* framework, the burden then shifts to the employer to provide "legitimate, nondiscriminatory reasons for the challenged employment action."   *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997).   This burden is "exceedingly light," as the employer must merely proffer a non-discriminatory reason for the adverse employment action, not prove it.   *Meeks v. Computer Assocs. Int'l*, 15 F.3d 1013, 1019 (11th Cir. 1994) (quoting *Perryman v. Johnson Prods. Co., Inc.*, 698 F.2d 1138, 1142 (11th Cir. 1983)).

Once the employer has proffered a legitimate nondiscriminatory reason for the adverse employment decision, the plaintiff "then has the ultimate burden of proving the reason to be a pretext for unlawful discrimination."   *Denney v. City of Albany*, 247 F.3d 1172, 1183 (11th Cir. 2001).   In order to prove that a defendant's articulated reason is a pretext, a plaintiff must demonstrate not only that the reason is false, but also that

intentional discrimination was the real reason. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993) ("[A] reason cannot be proved to be 'a pretext for discrimination' unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." (emphasis in original)).  To survive a motion for summary judgment, a plaintiff must rebut every legitimate, nondiscriminatory reason for the employment decision. *Crawford v. City of Fairburn, Ga.*, 482 F.3d 1305, 1308 (11th Cir. 2007).

### b.    Application

Upon careful consideration of the Amended Complaint, Defendant's motion and supporting memorandum, and the record evidence submitted in support of the motion, the undersigned concludes that Plaintiff has failed to establish a *prima facie* case of discrimination with respect to his complaint of discriminatory discipline by his employer. The Amended Complaint references only one incident in which Plaintiff experienced alleged disparate discipline on the basis of his race.  In particular, Plaintiff alleges that, on February 7, 2016, he was "disciplined by being placed on probation for not securing his vehicle." Doc. 10 at ¶ 9.  He further alleges that his punishment differed from that of Officer Overstreet despite his belief that Officer Overstreet "committed the same or substantially similar infraction, but was not disciplined or placed on probation." *Id.* at ¶ 11.

Although Plaintiff alleges that he was placed on probation as punishment, he testified at his deposition that he could not remember any superior telling him that he was on probation or issuing him any written notice that he was on probation.  Miller Depo. 164:15-166:5.  Indeed, Plaintiff testified that he was "guessing that [Sgt. Whaley] put me

on probation." *Id.* at 162:11-14.  Plaintiff's supposition appears to be the product of Plaintiff's belief that city policy imposed a sort of mandatory probation for an infraction like his.  *Id.* at 165:11-22.  However, in failing to respond to the motion for summary judgment, Plaintiff has not directed the court to any policy imposing mandatory probation as he described in the deposition.

Regardless of any confusion about the Amended Complaint's allegation that Plaintiff was placed on probation, as the above statement of undisputed facts makes clear, Plaintiff was only given a "formal counseling" by Sgt. Whaley for his failure to secure his vehicle.  This "formal counseling" is reflected on The City of Dothan Employee Disciplinary Action Report Form that was completed by Sgt. Whaley and signed by Plaintiff.  *See* Exh. 13 to Miller Depo. (Doc. 23-1 at 211).  This document indicates that Plaintiff's "offense" was in the "minor" category, and that it was his first offense.  *Id.*  As a "formal counseling," the discipline expressly did not reach the more serious levels of "written warning," "final written warning," or "discharge."  *Id.*  Substantively, the "formal counseling" simply noted the specific rule Plaintiff violated, recounted the circumstances surrounding the violation, and concluded with Sgt. Whaley's admonition that, "[i]n the future, Cpl. Miller is expected to follow policy and standard firearms safety."  *Id.*

When Plaintiff met with Chief Parrish to discuss Plaintiff's grievance concerning the "formal counseling," Chief Parrish explained that the "formal counseling," though a form of discipline, was more of a "training aid" than an employment action with potential ramifications for Plaintiff's ability to advance in his career.  *See* Exh. 17 (Doc. 24) at approx. 19:30-20:00; *id.* at 34:50 (indicating that the formal counselling is not viewed by

the Department as "punishment").  *See also* Miller Depo. 203:19-204:8.  Indeed, the Chief of Police explained that he too had received similar counselings during the course of his career.  *Id.*  Apart from his supposition that he was placed on probation, Plaintiff has not pointed to any tangible, much less "serious and material," consequence that the "formal counseling" had on the terms, conditions, or privileges of his employment.

On the record before the court, the undersigned cannot conclude that the written "formal counseling" Plaintiff received for failing to secure his vehicle amounts to an adverse employment action for purposes of Title VII.  As the above description of the "formal counseling" makes clear, it was simply a record of Plaintiff's receipt of counseling for his "minor" violation of Department rules.  It was explicitly the least severe form of discipline indicated on the form—*i.e.*, it was less severe even than a "written warning"— and, as Chief Parrish advised Plaintiff, his employer intended it more as a "training aid" than punishment as it would have no consequence to Plaintiff's ability to progress in his career.  As such, the "formal counseling" was, in effect, nothing more than the sort of counseling or performance memorandum that the Eleventh Circuit has long held insufficient, on its own, to constitute an actionable adverse employment action.  *See, e.g.*, *Davis*, 245 F.3d at 1240 (finding a "counseling memorandum" that only "express[ed] concern and criticism" about an employee's performance and did not cause any "tangible consequence" with regard to "loss of pay or benefits or further discipline" was not actionable).  Consequently, Plaintiff has failed to establish a *prima facie* case of race-based discrimination respecting his claim that he received discriminatory discipline from his employer.

Plaintiff has also failed to establish a *prima facie* case of disparate discipline because he has not alleged a viable comparator. For the reasons recounted in the statement of undisputed facts, the only potential comparator referenced in the Amended Complaint or during Plaintiff's deposition, Officer Overstreet, is not in all relevant respects similarly situated to Plaintiff. In particular, the undisputed evidence shows that Officer Overstreet briefly left his vehicle unsecured while in the course of an ongoing emergency investigation or pursuit, that he immediately requested over police radio that backup secure his vehicle, and that the vehicle was left unsecured for under a minute and as little as twenty-two seconds. Plaintiff, on the other hand, was not operating in an emergency or otherwise exigent circumstance when he neglected to secure his vehicle. Moreover, he did not request that another officer secure his vehicle, and his vehicle, with firearms in plain view, was left unsecured for approximately thirty minutes. Indeed, Plaintiff's vehicle was secured only because another officer happened upon it as it sat unsecured in a publicly accessible parking lot next to a civilian-occupied vehicle. Therefore, in no objective sense can the court conclude that Plaintiff and Officer Overstreet were similarly situated in their respective circumstances. Finally, Defendant has produced evidence that it has, in fact, on several occasions imposed discipline similar to that about which Plaintiff complains on similarly-situated Caucasian officers for violations of the weapons policy. *See* McKay Dec. ¶ 8. As such, Plaintiff has failed to allege a viable comparator for purposes of his disparate discipline claim.

Even if Plaintiff could establish a *prima facie* case with respect to his disparate discipline claim, Defendant has provided legitimate, non-discriminatory reasons for the

23

"formal counseling" that was administered to Plaintiff.  As set forth above, there is no dispute that Plaintiff violated the weapons policy by leaving his vehicle unsecured.  Indeed, Plaintiff admits his violation.   Accordingly, Defendant has provided legitimate, non-discriminatory reasons for any adverse employment action against Plaintiff due to his violation of policy.  Moreover, in documenting why Officer Overstreet was not formally counseled for briefly leaving his vehicle unsecured, as well as showing that several other similarly-situated Caucasian officers have been similarly disciplined, Defendant has also provided evidence rebutting the only piece of circumstantial evidence that Plaintiff has submitted in support of his claim of disparate discipline.   In failing to respond to Defendant's motion, Plaintiff plainly has not proven that Defendant's proffered reasons are pretext for intentional discrimination based upon Plaintiff's race.

At bottom, although it is evident from Plaintiff's deposition and the evidentiary exhibits submitted in support of the motion for summary judgment that Plaintiff disagrees with Defendant's assessment that Officer Overstreet's circumstances did not warrant discipline, Plaintiff has not overcome Defendant's showing that the decision to formally counsel Plaintiff, but not Officer Overstreet, was based upon the differing circumstances of the two incidents rather than the respective races of Officer Overstreet and Plaintiff.  As Plaintiff has produced no evidence beyond his own supposition that race had anything to do with Defendant's decision regarding Plaintiff's discipline, Plaintiff has not shown that a material factual dispute exists regarding whether Defendant's proffered justifications for its actions, even if unsound or unwise, are mere pretext for racial discrimination.  *See, e.g., Flowers v. Troup Cty., Ga., Sch. Dist.*, 803 F.3d 1327, 1338 (11th Cir. 2015) ("Title VII

24

does not allow federal courts to second-guess non-discriminatory business judgments, nor does it replace employers' notions about fair dealing in the workplace with that of judges. We are not a super-personnel department assessing the prudence of routine employment decisions, no matter how medieval, high-handed, or mistaken.  Put frankly, employers are free to [discipline] their employees for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason.") (quotations omitted).

For all of the foregoing reasons, Plaintiff has not established a *prima facie* case of discriminatory discipline with respect to the "formal counseling" that he received for leaving his vehicle unsecured.  Moreover, to the extent that Plaintiff could establish such a *prima facie* case, Defendant has provided legitimate, non-discriminatory reasons for its actions which Plaintiff has failed to rebut and disprove.  As such, Defendant is entitled to summary judgment on Plaintiff's Title VII disparate discipline claim.[2]

### 2. Title VII Retaliation Claim

#### a. Legal Standard

Retaliation claims under Title VII are considered within the same burden-shifting framework as are discrimination claims under the statute.

---

[2] Plaintiff's Amended Complaint only references one incident—the "formal counseling" discussed in this Recommendation—in which he was allegedly disciplined on the basis of his race. Although Plaintiff testified at his deposition about other instances in which he believes he was subjected to negative feedback or otherwise treated differently because of his race, he clarified that his claim of disparate discipline in this case is limited to his claim concerning the "formal counseling" and Defendant's failure to similarly counsel Officer Overstreet.  *See* Miller Depo. 231:16-232:8.

> Title VII . . . prohibits retaliation against an employee "because he has opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing [thereunder]." 42 U.S.C. § 2000e-3(a). A *prima facie* case of retaliation under Title VII requires the plaintiff to show that: (1) [he] engaged in an activity protected under Title VII; (2) [he] suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse employment action. *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001).

*Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008). If a plaintiff can establish a *prima facie* case of retaliation, "the burden shifts to the defendant to rebut the presumption of retaliation by producing legitimate reasons for the adverse employment action." *Johnson v. Booker T. Washington Broad. Serv., Inc.*, 234 F.3d 501, 507 n.6 (11th Cir. 2000). "If the defendant offers legitimate reasons, the presumption of retaliation disappears. The plaintiff must then show that the employer's proffered reasons for taking the adverse action were actually a pretext for prohibited retaliatory conduct." *Id; see also Furcron v. Mail Ctrs. Plus, LLC*, 843 F.3d 1295, 1310-11 (11th Cir. 2016).

In order to establish an adverse employment action for purposes of a *prima facie* Title VII retaliation claim, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (quotations omitted). This standard is "more liberal" than the standard for adverse employment actions under the discrimination provisions and, therefore, "'protects an

employee from a wider range of conduct than the discrimination provision does.'" *Crawford*, 529 F.3d at 974 (quoting *Phelan v. Cook Cty.*, 463 F.3d 773, 781 n.3 (7th Cir. 2006)).

With respect to the third prong, showing a causal connection between the statutorily protected expression and the adverse employment action, "'[t]o establish a causal connection, a plaintiff must show that the decision-makers were aware of the protected conduct, and that the protected activity and the adverse actions were not wholly unrelated.'" *Shannon v. Bellsouth Telecomm., Inc.*, 292 F.3d 712, 716-17 (11th Cir. 2002) (quoting *Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 590 (11th Cir. 2000). Close temporal proximity between the protected activity and the adverse action may be enough to establish that the protected activity and an adverse action were not wholly unrelated. *Id.* (citing *Bass v. Bd. of Cty. Comm'rs*, 256 F.3d 1095, 1119 (11th Cir. 2001)).

Even where a plaintiff establishes a *prima facie* case of retaliation, the plaintiff still must prove that the employer's desire to retaliate against the plaintiff was the "but-for" cause of the alleged retaliatory action. *See Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 359-60 (2013). "This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Id.* at 360.

### 2. Application

Plaintiff alleges that, after filing his charge of discrimination in August of 2016, beginning in September 2016 to the time of the filing of the Amended Complaint, Plaintiff was subjected to retaliation "in various ways, including by creating a hostile work

environment, by providing verbal and written negative feedback and by placing Plaintiff on a performance improvement plan ('PIP')." Doc. 10 at ¶ 14. According to Plaintiff, a PIP is a "form of discipline that threatens Plaintiff's employment with Defendant." *Id.* at ¶ 15. Plaintiff further alleges that, "[a]s part of the harassment, Plaintiff's superior, Lieutenant Brian Smith, a Caucasian Supervisor, falsely accused [Plaintiff] of sexually harassing a Caucasian female dispatcher, on or about September 19, 2016." *Id.* at ¶ 16. The undersigned will address Plaintiff's arguments in turn.

Plaintiff's first claim, that he was subjected to a retaliatory hostile work environment, appears to be entirely premised on an assortment of discrete instances in which Plaintiff believes he was unfairly targeted for negative feedback or improper accusations of misconduct by his superiors. Apart from the alleged accusation of sexual harassment levied against Plaintiff by Lt. Smith, the Amended Complaint does not describe the particulars of Plaintiff's hostile work environment claim. However, Plaintiff testified about a number of these supposed instances of harassment at his deposition. In particular, Plaintiff testified that Lt. Smith, Sgt. Phares, Sgt. Wieczorek, and Sgt. Kendrick, separately and discretely, subjected him to harassment that, cumulatively, amounted to a hostile work environment.

As to Lt. Smith, Plaintiff testified that Lt. Smith repeatedly "harassed" him about problems with the camera or GPS system in Plaintiff's patrol car (Miller Depo. 246:1-247:13); advised him about a dispatcher's informal complaint that Plaintiff's unwanted touching of her shoulder made her feel uncomfortable (Miller Depo. 248:2-251:23); and that Lt. Smith "backed-up" Sgt. Kendrick's PIP pertaining to Plaintiff's errors in

composing daily lineups (Miller Depo. 254:15-258:7).  As to Sgt. Phares, Plaintiff testified that he was harassed when Sgt. Phares degraded and undermined his work in a robbery/rape investigation by unduly rushing Plaintiff to complete his investigation (Miller Depo. 293:10-296:19); and when Sgt. Phares critiqued Plaintiff's performance as a field training officer ("FTO").  Miller Depo. 296:23-298:16.  Plaintiff also testified to his belief that Sgt. Phares's "mannerisms" conveyed that he did not respect Plaintiff as a black police officer, but that Sgt. Phares did not disrespect white police officers.  Miller Depo. 300:7-23.  As to Sgt. Wieczorek, Plaintiff testified that he was "harassed" several times, including when Sgt. Wieczorek: entered a negative "Guardian Tracking" item pertaining to Plaintiff's disregard of backup (Miller Depo. 307:15-20); yelled at Plaintiff about his medical leave issues (Miller Depo. 307:22-308:7); counseled Plaintiff on Guardian Tracking about his failure to provide backup to Sgt. Wieczorek during a traffic stop (Miller Depo. 308:12-19); and told Plaintiff not to say things over the police radio that white officers were allowed to say (Miller Depo. 308:21-309:6).  Finally, as to Sgt. Kendrick, Plaintiff testified that he was harassed by Sgt. Kendrick's PIP concerning Plaintiff's errors in composing daily lineups (Miller Depo. 316:19-317:1) and when Sgt. Kendrick wanted to discuss with Plaintiff an email that he had sent a police department employee in response to her email about collection of evidence of a hate crime at Plaintiff's residence (*see* Miller Depo. 331:9-333:7).

The Eleventh Circuit has recognized a claim for retaliatory hostile work environment.  *See Gowski v. Peake*, 682 F.3d 1299, 1311-12 (11th Cir. 2012).  "To establish a hostile work environment claim under Title VII, the plaintiff must show that the

"'workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Id.* at 1311 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993).  In the retaliatory hostile work environment context,

> [t]he requirement that the harassment be "severe or pervasive" contains an objective and a subjective component. *Miller* [*v. Kenworth of Dothan*, 277 F.3d 1269, 1276 (11th Cir. 2002)]. "Thus, to be actionable, this behavior must result in both an environment that a reasonable person would find hostile or abusive and an environment that the victim subjectively perceive[s] . . . to be abusive." *Id.* (internal quotation marks omitted). In evaluating the objective severity of the harassment, this court looks at the totality of the circumstances and considers, among other things: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." *Id.* "[W]hether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances." *Harris*, 510 U.S. at 23.

*Gowski*, 682 F.3d at 1312.

Upon review, the undersigned concludes that Plaintiff has failed to establish a *prima facie* case of retaliation via his claim of a retaliatory hostile work environment.  To begin with, numerous instances of harassment identified by Plaintiff preceded his August 2016 filing of the charge of discrimination.  As such, they cannot support a claim that Plaintiff was subjected to a retaliatory hostile work environment based on his filing of the charge of discrimination.   These supposed instances of retaliatory harassment that predated Plaintiff's protected activity include the following: 1) Sgt. Wieczorek's January 19, 2015, negative Guardian Tracking entry regarding Plaintiff's disregard of his backup (*see* Doc. 23-1 at 193); Sgt. Phares's June 15, 2015, negative Guardian Tracking entry about Plaintiff's performance as an FTO (*see* Doc. 23-1 at 189-90); Sgt. Wieczorek's September

9, 2015, Guardian Tracking entry counseling Plaintiff for failing to provide him with backup (*see* Doc. 23-1 at 188-89); Sgt. Phares's rushing Plaintiff to complete a robbery/rape investigation (*see* McKay Dec. (Doc. 23-2) at ¶ 4); and Lt. Smith's August 11, 2016, Guardian Tracking entry concerning Plaintiff's upkeep of his camera and GPS functionality (*see* Doc. 23-1 at 182-83).  In addition to these instances that predated Plaintiff's protected conduct, Plaintiff could not provide dates for other instances of supposed harassment, including Sgt. Phares's purported general disrespect and "mannerisms" (*see* Miller Depo. 293:5-294:12) and Sgt. Wieczorek's admonishment to Plaintiff about his use of the radio while failing to counsel others for the same conduct (*see* Miller Depo. 308:21-309:6).  As such, these instances of supposed harassment appear to be more just generalized grievances that likely crystallized in Plaintiff's mind over time rather than specific conduct in response to Plaintiff's filing of a charge of discrimination.

With these instances of supposed harassment removed from the equation, Plaintiff's claim of a retaliatory hostile work environment distils to only a few primary items, namely: 1) Lt. Smith's conversation with Plaintiff regarding the female dispatcher's informal complaint that Plaintiff made her feel uncomfortable with an unwanted touching; 2) the PIP authored by Sgt. Kendrick; 3) the conversation between Sgt. Kendrick and Plaintiff regarding Plaintiff's email; and 4) Sgt. Wieczorek's "yelling" at Plaintiff about issues with his use of medical leave.  Unfortunately for Plaintiff, these instances, considered individually and collectively, are not so objectively hostile or abusive that they fostered a severely and pervasively hostile working environment.

The undersigned first considers the interaction with Lt. Smith concerning the dispatcher's informal complaint.  Plaintiff testified that he and Lt. Smith had a long meeting in which they discussed the dispatcher's informal complaint.   Miller Depo. 248:2-13. Plaintiff insisted that he did not do anything wrong and requested that Lt. Smith personally investigate the dispatcher's complaint.  *Id.* at 250:10-251:13.  Plaintiff testified that he was being unjustly accused of sexual harassment or assault, and he described the conversation with Lt. Smith as a "very, very heated argument[.]"  *Id.* at 251:21-23.   Nevertheless, Plaintiff also testified that Lt. Smith advised him that there was no formal complaint against him, that he was not disciplined in any way for the alleged unwanted touching, and that he suffered no consequence to any of the terms, conditions, benefits, or privileges of his employment due to the incident.  *Id.* at 276:11-278:8.  In summary, then, this purported incident of retaliatory harassment was based only upon a single, informal complaint by a co-worker, was limited to a single interaction between Plaintiff and Lt. Smith, resulted in no discipline or other consequences to the terms and conditions of Plaintiff's employment, and did not otherwise interfere with Plaintiff's ability to do his job.

Plaintiff also testified that Sgt. Kendrick's PIP supports his claim of a retaliatory hostile work environment.   The PIP is dated November 21, 2016, more than three months after Plaintiff filed his charge of discrimination.  *See* Doc. 23-1 at 236.  The PIP concerned Sgt. Kendick's finding that Plaintiff had failed to satisfactorily discharge his duties to "prepar[e] a squad line-up in an accurate and timely manner" and "email[] nightly briefing notes to the entire squad for Officers that were off that particular night and may have missed important information."  Doc. 23-1 at 237.  Sergeant Kendrick found that Plaintiff "has

failed to complete the line up accurately and in a timely manner on several occasions and depends on Officers to complete the line up for him." *Id.* Sergeant Kendrick also observed that Plaintiff "was instructed as far back as mid 2015 to prepare and email briefing notes, to which he has prepared less than six emails." *Id.* The PIP instructed that Plaintiff is to "prepare the line-up for the next day prior to ending the current shift and email it to all Supervisors . . . [and] will email the entire squad briefing notes given at briefing." *Id.* at 236. The PIP further instructs that "[p]rogress will be monitored for four months with regular reviewing to ensure compliance." *Id.*

Plaintiff testified that he challenged Sgt. Kendrick's findings on the basis that Sgt. Kendrick was not there in 2015 and that Sgt. Kendrick could not produce proof of repeated mistakes in completing the lineups. Miller Depo. 255:6-256:21. Nevertheless, Plaintiff also admitted that he made several errors on the lineup that he submitted on the day that Sgt. Kendrick completed the PIP, including getting his own unit number wrong. Miller Depo. 285:19-289:12. Plaintiff further testified that the PIP did not cause any decrease in his pay, change in his benefits, or change in his job title, rank, or responsibilities. Miller Depo. 292:17-293:4. In summary, then, this purported instance of retaliatory harassment is based upon Plaintiff's completion of a lineup that he admits was riddled with errors, consisted only of a mild performance memorandum describing Plaintiff's errors and instructing him to improve in the described functions, and indisputably did not result in any discipline or other consequences to the terms and conditions of Plaintiff's employment, and did not otherwise interfere with his ability to do his job.

Plaintiff also testified that a conversation he had with Sgt. Kendrick concerning the tone of an email Plaintiff sent to another employee constituted retaliatory harassment. *See* Miller Depo. 323:10324:5. Plaintiff testified that the employee had emailed him to accuse him of improperly collecting evidence related to a noose that was hung in his yard. Miller Depo. 331:9-14. After Plaintiff responded to the employee by essentially advising her to do her job better, Sgt. Kendrick wanted to discuss Plaintiff's response. Miller Depo. 331:16-332:5, 333:2-5. Plaintiff does not indicate what, precisely, Sgt. Kendrick said or did that constitutes harassment. Rather, it appears Plaintiff believes that Sgt. Kendrick was harassing him because Sgt. Kendrick, a superior officer, was inserting himself into a matter between Plaintiff and the other employee, and because Sgt. Kendrick did not apologize to Plaintiff or otherwise express sympathy to him for the hanging of the noose.[3] Miller Depo. 331:16-333:7. Plaintiff did not testify that he was disciplined in any way for his email, or that there was any consequence for the terms and conditions of his employment or his ability to do his job as a result of Sgt. Kendrick's discussion of the email with Plaintiff.

The final supposed piece of retaliatory harassment cited by Plaintiff in his deposition testimony was Sgt. Wieczorek's confrontation with him regarding his use of

---

[3] Although Plaintiff initially advised responding police officers that he believed two local youths had hung the noose in his yard, at his deposition he professed his belief that someone from the police department was responsible. Miller Depo. 324:12-15. Plaintiff's evidence of such conduct, however, is wholly lacking. Plaintiff testified that he believes someone from the City placed the noose in his yard because it occurred two to three weeks after Plaintiff provided Sgt. Whaley with his new address. *Id.* at 325:5-326:9; 330:8-14. Plaintiff also admitted that he had recently changed his address and was required by Department policy to provide his new address to the Department. *Id.* at 330:21-331:2. In any event, the hanging of the noose occurred prior to Plaintiff's filing of the charge of discrimination and, therefore, cannot support Plaintiff's claim of a retaliatory hostile work environment.

medical leave.   He testified that Sgt. Wieczorek was questioning him "in front of a juvenile" about his FMLA leave related to "blood clot issues" when "out of nowhere . . . he just yelled at me and degraded me[.]"   Miller Depo. 307:22-308:8.   Plaintiff did not testify with any particularity about the content of Sgt. Wieczorek's yelling or how it was degrading to Plaintiff.   Defendant investigated the incident by reviewing Plaintiff's recording of the interaction and concluded that both Plaintiff and Sgt. Wieczorek acted inappropriately and were due to be "counseled regarding appropriate temperament and communications in the workplace." McKay Decl. ¶ 4.   Apart from the fact that he had filed a previous charge of discrimination nearly five months prior, Plaintiff does not provide any evidence that Sgt. Wieczorek's actions had anything to do with Plaintiff's filing of the charge.   Moreover, Plaintiff conceded that the episode had no effect on his pay or benefits or his job title and rank.   Miller Depo. 311:23-312:5.

Considered both individually and cumulatively, the undersigned cannot conclude that the incidents of supposed harassment referenced by Plaintiff were so hostile and abusive as to foster a severely and pervasively hostile work environment as a result of Plaintiff's protected conduct.   For the most part, they reflect discrete instances in which Plaintiff was subjected to mild criticism or counseling for his conduct.   Although Plaintiff appears to disagree that any criticism or counselling was ever justified, he has not shown how any of the instances he identified come even close to the level of severity required to sustain a retaliatory hostile work environment claim.   *See, e.g., Gowski*, 682 F.3d at 1313-14 (finding evidence sufficient to support jury verdict for retaliatory hostile work environment where plaintiff physicians produced sufficient evidence of "a workplace filled

with intimidation and ridicule," including that they had their privileges and access to positions in the hospital limited, and were "removed . . . from committees and projects, prohibited from conducting research, reassigned to different wards, and given low proficiency ratings"). In other words, Plaintiff must produce evidence of more than a few "unpleasant meetings" with his superiors to sustain a claim for retaliatory hostile environment. *Clark v. S. Broward Hosp. Dist.*, 601 F. App'x 886, 899-900 (11th Cir. 2015). This is especially so where Plaintiff has produced no evidence or testimony tending to show that any of the instances he identifies caused any change in the terms or conditions of his employment or otherwise affected his ability to do his job. Accordingly, the undersigned concludes that Plaintiff's claim that he endured a retaliatory hostile work environment is without merit, and that Defendant is entitled to summary judgment on such claim.

Apart from his claim that he suffered a retaliatory hostile work environment, Plaintiff appears to argue that he was retaliated against due to his receipt of "verbal and written negative feedback and by placing Plaintiff on a performance improvement plan ('PIP')." Doc. 10 at ¶ 14. The undersigned has already extensively discussed the instances in which Plaintiff claims he was given negative feedback and placed on a PIP. To the extent Plaintiff indeed intends to argue that these items are separate actionable forms of retaliation that are not subsumed within his claim for retaliatory hostile work environment, he has failed to state a *prima facie* case of retaliation.

First, Plaintiff has not shown that any of the "decision makers" responsible for the negative feedback or PIP were even aware of Plaintiff's charge of discrimination. Nor has

36

Plaintiff produced any other evidence of a causal link between any negative feedback or the PIP and Plaintiff's charge of discrimination.  Indeed, insofar as the "negative feedback" refers to several mildly critical Guardian Tracking entries, the undersigned is mindful that the record indicates that most such entries occurred prior to Plaintiff's filing of the charge of discrimination, *supra*.  Finally, Plaintiff has not shown how any of the "negative feedback" or placement on the PIP constituted an adverse employment action for purposes of a *prima facie* Title VII retaliation claim.  Plaintiff does not "allege that it had any significant impact on his employment." *See Hall v. Dekalb Cty. Gov.*, 503 F. App'x 781, 790 (11th Cir. 2013) (finding no materially adverse action where, although the plaintiff alleged that a "written counseling" was unjustified, "he failed to explain how it negatively impacted his employment"); *see also Perry v. Rogers*, 627 F. App'x 823, 832 (11th Cir. 2015) (finding that an employee's written counseling could not support a claim for retaliation because the employee did not demonstrate that "it negatively impacted" the employee "in a material way" and the counseling "did not constitute formal discipline" under the employer's disciplinary policy).  Furthermore, there is no showing that mere mild negative feedback, or a written performance memorandum premised on errors admitted by the employee, "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co.*, 548 at 68.  In other words, all of the perceived slights, criticisms, and counselings identified by Plaintiff are simply too trivial to constitute a materially adverse employment action. *Crawford*, 529 F.3d at 973 n.13.  Thus, Plaintiff has not established a *prima facie* case with respect to his claim of retaliation.

## III.   MOTION FOR LEAVE TO AMEND

Plaintiff seeks leave to further amend the Amended Complaint to add claims for discriminatory and retaliatory termination following his termination on February 2, 2017. *See* Doc. 26 at 5-8.  Defendant opposes the motion, arguing that granting leave to amend at this juncture—after the pleadings are closed, discovery is completed, and the parties have filed dispositive motions—would prejudice Defendant.  Doc. 30 at 4.  Defendant also argues that leave to amend should be denied as futile because Plaintiff's claims related to his termination are untimely.  *Id.*

Plaintiff does not cite any authority in his motion for leave to amend.  Rule 15 of the Federal Rules of Civil Procedure permits a plaintiff to amend his complaint as a matter of course within twenty-one days of service of the complaint, or within twenty-one days after service of a responsive pleading or a motion under Rule 12(b), (e), or (f).  Fed. R. Civ. P. 15(a)(1).  Where the plaintiff may not amend as a matter of course, the plaintiff must obtain consent of the defendant or leave of court to amend the complaint.  Fed. R. Civ. P. 15(a)(2).  In such cases, "[t]he court should freely give leave when justice so requires."  *Id.* Courts have long recognized that this standard for allowing amendment under the Rule is "liberal."  *See, e.g., In re Engle Cases*, 767 F.3d 1082, 1108 (11th Cir. 2014).  However, the Rules' mandate for "liberal" allowance is not without readily discernible limits, including, especially, where the requested amendment would be futile.  *See id.* at 1108-09 ("[A] motion for leave to amend may appropriately be denied (1) where there has been undue delay, bad faith, dilatory motive, or repeated failure to cure deficiencies by amendments previously allowed; (2) where allowing amendment would cause undue

prejudice to the opposing party; or (3) where amendment would be futile.") (quotations omitted).  *See also Coventry First, LLC v. McCarty*, 605 F.3d 865, 870 (11th Cir. 2010) (quoting *Cockrell v. Sparks*, 510 F.3d 1307, 1310 (11th Cir. 2007)) ("A proposed amendment may be denied for futility 'when the complaint as amended would still be properly dismissed.'").

Here, Plaintiff is not entitled to amend his complaint because the requested amendment would be futile considering that Plaintiff's claims for discriminatory and retaliatory termination are, as argued by Defendant, time-barred.  When an employee has received a notice-of-right-to-sue letter from the EEOC, "she has 90 days to file a civil action against the employer."  *Stamper v. Duval Cty. Sch. Bd.*, 863 F.3d 1336, 1340 (11th Cir. 2017) (citing 42 U.S.C. § 2000e-5(f)(1)).   In the proposed Second Amended Complaint, Plaintiff alleges that he received his right-to-sue letter from the EEOC "on or about June 16, 2017."  Doc. 26 at 6, ¶ 14.  Plaintiff filed his motion for leave to amend and proposed Second Amended Complaint on October 30, 2017, approximately 136 days after receipt of the letter.  As such, Plaintiff failed to file his discriminatory and retaliatory termination claims within the time permitted to do so by Title VII.

Plaintiff's motion for leave to amend provides no explanation for his failure to timely file his proposed Second Amended Complaint.  Nor does the motion provide any authority for his implicit proposition that his discriminatory and retaliatory termination claims are timely presented, despite the lapse of ninety days, because he had already filed an action concerning his expressly different claims of discriminatory discipline and retaliation.  The language in the EEOC's standard right-to-sue letter is clear: "You may file

a lawsuit against the respondent(s) under federal law based on this charge in federal or state court.  Your lawsuit **must be filed WITHIN 90 DAYS of your receipt of this notice**; or your right to sue based on this charge will be lost." *See* Doc. 1-1 (emphasis in original). The letter makes clear that any lawsuit involving the claim made the basis of the specific charge referenced in the letter must be filed within 90 days.  This clear and unambiguous requirement would be eviscerated if a plaintiff could delay filing a lawsuit, without providing any justification for doing so, due to the simple expedient that the plaintiff already had pending a lawsuit concerning a prior charge.  A typical employment discrimination lawsuit could remain pending for years.  Nothing in the statute allows a plaintiff to avoid the ninety-day limitations period, for months or possibly years, based upon the pendency of a prior-filed lawsuit challenging different alleged acts of discrimination or retaliation.  Accordingly, Plaintiff's motion for leave to amend the complaint is due to be denied as futile because the claims he seeks to add in the proposed Second Amended Complaint are time-barred.

## IV.   CONCLUSION

For all of the foregoing reasons, the undersigned Magistrate Judge hereby RECOMMENDS that Defendant's Motion for Summary Judgment (Doc. 22) be GRANTED, and that the Amended Complaint be dismissed with prejudice.  The undersigned further RECOMMENDS that Plaintiff's Motion for Leave to Amend Complaint (Doc. 26) be DENIED.  It is further

ORDERED that the parties are DIRECTED to file any objections to the said Recommendation on or before **April 26, 2018**.  Any objections filed must specifically

identify the findings in the Magistrate Judge's Recommendation to which the party is objecting.  Frivolous, conclusive, or general objections will not be considered by the District Court.  The parties are advised that this Recommendation is not a final order of the court and, therefore, it is not appealable.

Failure to file written objections to the proposed findings and recommendations in the Magistrate Judge's report shall bar the party from a *de novo* determination by the District Court of issues covered in the report and shall bar the party from attacking on appeal factual findings in the report accepted or adopted by the District Court except upon grounds of plain error or manifest injustice.  *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982); s*ee Stein v. Reynolds Sec., Inc.*, 667 F.2d 33 (11th Cir. 1982); s*ee also Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (*en banc*) (adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981).

Done this 12th day of April, 2018.


/s/ Wallace Capel, Jr.
CHIEF UNITED STATES MAGISTRATE JUDGE